Filed 12/27/23  P. v. Jimenez CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B323963 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA102583) |
| v. | |
| LUIS DANIEL JIMENEZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Amy N. Carter, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Breana Frankel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, and Stephanie Miyoshi and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Police discovered a semi-automatic rifle with various statutorily prohibited features in a vehicle in which defendant Luis Daniel Jimenez (defendant), a prior felon, was a passenger. A jury found defendant guilty of being a felon in possession of a firearm and possessing an assault weapon. We are asked to decide whether the criminal statutes on which the convictions rest are unconstitutional in light of the Supreme Court's ruling in *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S. 1. We also consider whether defendant's convictions are supported by substantial evidence and whether the trial court abused its discretion in denying defendant's *Romero*[1] motion at sentencing.

## I. BACKGROUND

### A. *The Evidence at Trial*

Los Angeles County Sheriff's Deputy Dorian Ventura was on patrol with his partner in the Lennox neighborhood around 7:00 p.m. on August 2, 2020. The deputies spotted a white Chevrolet Tahoe that matched the description of a vehicle involved in a crime that the appellate record does not reveal. The Tahoe backed into a parking spot outside a marijuana dispensary, and the deputies stopped their patrol car a few yards away with the two vehicles facing one another. Deputy Ventura saw three people inside the Tahoe: one in the driver's seat, one in the front passenger seat, and one in a rear passenger seat. He identified defendant as the person in the front passenger seat.

Deputy Ventura testified the Tahoe's occupants "almost instantaneously" opened the doors and attempted to flee.

---

[1] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

2

Defendant, who had a cast on his leg, took a few steps but "did a sighing motion of defeat" and raised his hands. Deputy Ventura detained defendant while his partner apprehended the person from the rear passenger seat. Neither Deputy Ventura nor his partner chased the driver, who got away.

Deputy Ventura observed a firearm through the Tahoe's open passenger door. The weapon was between the front passenger seat and the center console, with the muzzle facing downward. Deputy Ventura also found a shell casing on "the front passenger side door window ledging."

The firearm, which has no serial number, was displayed at trial. It is a semi-automatic, centerfire rifle less than 30 inches in length with a telescoping stock, pistol grip, detachable magazine, and flash suppressor.[2]

Deputy Ventura testified defendant made a Mirandized admission that he was in the Tahoe but denied he owned the vehicle. A notice of release of liability on file with the DMV, however, revealed defendant had recently purchased the Tahoe but had not yet registered it in his name. The seller lived on the same street as defendant.

At defendant's later trial on the possession of an assault weapon and possession of a firearm by a felon charges, he testified he had never seen the Tahoe before and he did not know why his name was on the notice of release of liability. Defendant claimed his girlfriend dropped him off at the marijuana

---

[2] Deputy Ventura testified the rifle is equipped with a binary trigger system, meaning that it fires both when the trigger is pulled and when it is released, i.e., "one trigger stroke could do two shots[.]" In this sense, he described the rifle as "beyond semiautomatic."

3

dispensary and after a few minutes inside, defendant walked out and saw the deputies' vehicle stopped "nose-to-nose" with the Tahoe.  Defendant saw one of the sheriff's deputies pursue the Tahoe's fleeing driver, and when the deputy returned to the parking lot covered in dirt and leaves without apprehending the driver, defendant testified he laughed.  At that point, defendant claimed the deputy "g[o]t real mad" and arrested him.

### B.     Verdict and Sentencing

The jury convicted defendant on both the possession of a firearm by a felon (Pen. Code,[3] § 29800, subd. (a)(1)) and possession of an assault weapon (§ 30605, subd. (a)) charges.  The jury also found true an allegation that defendant had been convicted of making criminal threats (§ 422) in 2016, served a prior term in prison, and was on probation, supervision, or parole at the time of the crimes of conviction.

The trial court denied defendant's motion to strike or dismiss his prior conviction.  The court imposed a sentence of six years in state prison for possession of a firearm by a felon: the high term of three years doubled pursuant to the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12).  The trial court did not impose a sentence for possession of an assault weapon but stated "[c]ount [three] is now stayed pursuant to Penal Code section 654."

---

[3]     Undesignated statutory references that follow are to the Penal Code.

## II.  DISCUSSION

Defendant contends the provisions of sections 29800 and 30605 at issue in this appeal are unconstitutional on their face. The United States Supreme Court's articulation of the Second Amendment right to bear arms in *District of Columbia v. Heller* (2008) 554 U.S. 570, however, was careful to emphasize that the right should not be understood to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill" and was limited so as not to transgress the historical "prohibit[ion] [on] the carrying of 'dangerous and unusual weapons.'" (*Id.* at 626-627.)  The high court has not since repudiated the contours of the Second Amendment right defined in *Heller*—including in *Bruen*, which holds regulation of conduct covered by the Second Amendment must be "consistent with the Nation's historical tradition of firearm regulation." (*Bruen, supra*, 597 U.S. at 24.)  Because the criminal laws at issue here doubly fall outside the scope of the Second Amendment right as defined in *Heller* (i.e., defendant was convicted for possessing the rifle as a felon and the rifle qualifies as "dangerous and unusual"), defendant's constitutional challenge fails.

Defendant's remaining arguments fail too.  As to the sufficiency of the evidence, Deputy Ventura's testimony that defendant was seated immediately adjacent to the gun—particularly in combination with the notice of release of liability indicating the Tahoe belonged to defendant—is substantial evidence he had constructive possession of the gun.  As to the trial court's decision to deny defendant's *Romero* motion, the court's ruling, which accounted for all relevant factors including the nature of defendant's offenses and his background, character, and prospects, was not an abuse of discretion.

5

*A.* *We Exercise Our Discretion to Consider Defendant's Arguments in His Opening Brief, Raised for the First Time on Appeal*

In the trial court, defendant did not argue section 29800, subdivision (a)(1) and section 30605, subdivision (a) were unconstitutional. Defendant nevertheless urges us not to hold the argument he makes now to be forfeited because, in his view, the Supreme Court's opinion in *Bruen*—issued the day after defendant's sentencing—upended the "well-settled" principle that the criminal prohibitions in these laws do not violate the Second Amendment. We will disregard the forfeiture, but only insofar as defendant's contention that the statutes are unconstitutional on their face relies on *Bruen*.

Defendant's attempt to raise an as-applied constitutional challenge to section 29800, subdivision (a)(1) for the first time in his appellate reply brief, on the other hand, is a different matter. Defendant contends his prior conviction was not a violent felony and "there is substantial precedent for differentiating between violent and nonviolent felons . . . ." This argument, which the Attorney General did not have an opportunity to address in his respondent's brief, is forfeited. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218 ["'Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief'"].)

*B.* *Overview of the Supreme Court's Construction of the Second Amendment Right to Bear Arms from* Heller *to* Bruen

"A well-regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall

6

not be infringed." (U.S. Const., 2d Amend.) Beginning with *Heller* in 2008, the Second Amendment has been understood to "protect an individual right to keep and bear arms for self-defense" (*Bruen, supra*, 597 U.S. at 17), albeit subject to certain exceptions that are important for our purposes. Our summary of *Heller* and its progeny focuses on the two exceptions implicated by this appeal: prohibitions against felons possessing firearms and prohibitions against dangerous and unusual weapons.

### *1.* Heller

The high court in *Heller* held the District of Columbia's "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." (*Heller, supra*, 554 U.S. at 635.) Reasoning that the reference to a "well regulated Militia" in the Second Amendment's "prefatory clause" does not "limit" the operative clause and instead "announces a purpose" (*id.* at 577), the Court emphasized self-defense is "the *central component*" of the Second Amendment right (*id.* at 599). In other words, the role of the prefatory clause is to explain why the pre-existing "fundamental right[ ] of Englishmen" to keep and bear arms for self-defense (*id.* at 594) was written into the Constitution while other such rights were not: "[T]he threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution." (*Id.* at 599.)

The Court was careful to caution, however, that the right secured by the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for

7

whatever purpose." (*Id.* at 626.) Although the Court did "not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," it emphasized "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." (*Ibid.*) The high court also emphasized this list of "presumptively lawful regulatory measures" did "not purport to be exhaustive." (*Ibid.*, fn. 26.)

The high court in *Heller* "also recognize[d] another important limitation on the right to keep and carry arms." (*Heller*, *supra*, 554 U.S. at 627.) Harmonizing its holding with *United States v. Miller* (1939) 307 U.S. 174 (*Miller*), which affirmed the defendant's conviction for illegally transporting a short-barreled shotgun under the National Firearms Act,[4] the Court held "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . . ." (*Heller*, *supra*, at 625.) The Court observed that

---

[4] *Miller* reasoned that, "[i]n the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense." (*Miller*, *supra*, 307 U.S. at 178.)

8

restricting Second Amendment protection to weapons "'in common use at the time'" is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' [Citations.]" (*Id.* at 627.)

When discussing the dangerous and unusual weapon limitation on the Second Amendment's right to bear arms, the high court cited "M-16 rifles and the like" as examples of weapons that are proper subjects of regulation. (*Heller*, *supra*, 554 U.S. at 627.) The Court observed that although "[i]t may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large[,] . . . the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." (*Id.* at 627-628.)

### 2. McDonald

In *McDonald v. City of Chicago, Ill.* (2010) 561 U.S. 742 (*McDonald*), the Supreme Court considered a challenge to local laws in Illinois similar to the District of Columbia scheme struck down in *Heller*. (*McDonald*, *supra*, 561 U.S. at 750.) Justice Alito's majority opinion held the Second Amendment "right to keep and bear arms for the purpose of self-defense" recognized in *Heller* applies to the states through the Due Process Clause of the Fourteenth Amendment. (*Id.* at 750.) Notably for our purposes, the opinion for the court expressly reaffirmed *Heller* (*id.* at 767-768), and a portion of Justice Alito's opinion joined by three other Justices also "repeat[ed] [the] assurances" given in *Heller* that nothing in the Court's Second Amendment jurisprudence should "cast doubt on such longstanding regulatory measures as

9

'prohibitions on the possession of firearms by felons and the mentally ill . . . .'" (*Id.* at 786.)

### 3. Bruen

Most recently in *Bruen*, the United States Supreme Court considered a challenge to a New York law conditioning the grant of a license to carry a concealed handgun on a showing of proper cause, which New York courts construed to mean a demonstration of the applicant's special need for self-defense. (*Bruen*, *supra*, 597 U.S. at 12.)

Writing for a six-justice majority, Justice Thomas rejected the means-end scrutiny that some lower courts used to assess the constitutionality of laws regulating firearms following *Heller*. (*Bruen*, *supra*, 597 U.S. at 19.) According to that approach, courts first asked whether challenged laws regulated activity falling outside the scope of the Second Amendment right as originally understood. (*Id.* at 18.) If so, the law was valid; if not, courts analyzed "'how close the law [came] to the core of the Second Amendment right and the severity of the law's burden on that right.' [Citation.]" (*Ibid.*)

*Bruen* held this two-step approach included "one step too many." (*Bruen*, *supra*, 597 U.S. at 19.) As explained by the high court, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command' [Citation.]" (*Id.* at 24.) To

meet its burden, the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." (*Id.* at 30.)

The *Bruen* Court began its analysis of the challenged New York law by emphasizing that none of the exceptions discussed in *Heller* applied. (*Bruen*, *supra*, 597 U.S. at 31-32 ["It is undisputed that [the plaintiffs]—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects. [Citation.] Nor does any party dispute that handguns are weapons 'in common use' today for self-defense"].) The Court then determined the proposed activity—carrying handguns in public for self-defense—falls within the plain text of the Second Amendment and surveyed potential historical antecedents for the state's proper-cause requirement. (*Id.* at 32-33.) Finding only "a handful of late-19th-century jurisdictions" regulated "the public carry of commonly used firearms for self-defense" and no "historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense," the Court held the proper-cause requirement was unconstitutional. (*Id.* at 38-39.)

The Court stressed that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of . . . licensing regimes [that] do not require applicants to show an atypical need for armed self-defense . . . ." (*Bruen*, *supra*, 597 U.S. at 38, fn. 9.) Among other things, the Court emphasized that such regimes, "which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that

11

those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" covered by the Second Amendment. (*Ibid*.)

Justice Kavanaugh, joined by Chief Justice Roberts, wrote separately to "underscore" that licensing regimes without a proper-cause requirement—as well as the presumptively lawful firearm regulations first identified in *Heller*—remain valid. (*Bruen*, *supra*, 597 U.S. at 79-80 (conc. opn. of Kavanaugh, J.); see also *id*. at 80-81 (conc. opn. of Kavanaugh, J.) [quoting passages in *Heller* and *McDonald* explaining the Second Amendment right to bear arms is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" and declining to cast doubt on prohibitions on the possession of firearms by felons or the historical tradition of prohibiting the carrying of dangerous and unusual weapons].) In a separate concurring opinion, Justice Alito likewise emphasized that *Bruen* did not "disturb[ ] anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." (*Id*. at 72 (conc. opn. of Alito, J.).)

C. *Section 29800, Subdivision (a)(1) Is Constitutional on Its Face*

Section 29800, subdivision (a)(1) provides, in pertinent part, that "[a]ny person who has been convicted of a felony under the laws of the United States, the State of California, or any other state, government, or country, or [certain firearm offenses] . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony."

As mentioned, plaintiff's opening brief presents only a facial challenge to this statute. ""To support a determination of

12

facial unconstitutionality, . . . [challengers] cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute.'" [Citation.] Rather, the 'minimum' our cases have accepted is a showing that the statute is invalid 'in the generality or great majority of cases.' [Citations.]" (*People v. Buenrostro* (2018) 6 Cal.5th 367, 388; see also *Americans for Prosperity Foundation v. Bonta* (2021) ___ U.S. ___ [141 S.Ct. 2373, 2387] ["Normally, a plaintiff bringing a facial challenge must 'establish that no set of circumstances exists under which the [law] would be valid,' [citation], or show that the law lacks 'a plainly legitimate sweep'"].)

Defendant does not come close to meeting that minimum showing here. As we have already cataloged, the high court has repeatedly reaffirmed that the Second Amendment right to bear arms its recent decisions recognize is a right that does not disturb longstanding prohibitions on the possession of firearms by felons. The felon firearm possession prohibition found in section 29800, subdivision (a)(1), which is a continuation without substantive change of a statutory prohibition that long predates *Heller* (Stats.1953, ch. 36, p. 654, § 1), falls squarely within the type of undoubtedly legitimate prohibition the high court has recognized. (*People v. Alexander* (2023) 91 Cal.App.5th 469, 479.)

Although the Court in *Heller* did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment" (*Heller*, *supra*, 554 U.S. at 626), the majority was not agnostic about whether its list of presumptively lawful regulatory measures, including felon in possession of firearms laws, were historically justified. Responding to Justice Breyer's dissent "chid[ing]" the majority for, among other things, "not

13

providing extensive historical justification for those regulations of the right that [it] describe[d] as permissible," the majority emphasized "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." (*Id.* at 635.) Moreover, the majority viewed its list or presumptively constitutional firearms laws as potentially *under*-inclusive— because the list "[did] not purport to be exhaustive" (*id.* at 627, fn. 26)—and gave no indication that it might somehow be over-inclusive.

Some courts, focusing on the factual scenario presented in *Heller* itself (the case concerned an outright ban on the possession of handguns), observe that the case does not definitively resolve all aspects of *who* may lawfully possess a firearm, *when* or *where* they may do so, or *how* they may obtain the weapon. (See, e.g., *United States v. Scroggins* (5th Cir. 2010) 599 F.3d 433, 451; *People v. Odell* (2023) 92 Cal.App.5th 307, 317.) That is true, but it does not undermine the conclusion we have drawn—based on repeated admonitions from the high court itself (see, e.g., *McDonald, supra,* 561 U.S. at 742)[5]—about the scope of the right to bear arms that the court recognized. (See, e.g., *United States v. Vongxay* (9th Cir. 2010) 594 F.3d 1111, 1115

---

[5] Although *Heller*'s list of presumptively lawful regulatory measures was only quoted in Justice Kavanaugh's concurring opinion in *Bruen*, the six-justice majority opinion is replete with references to the right of "law-abiding" citizens to carry a handgun for self-defense. (See, e.g., *Bruen, supra,* 597 U.S. at 8; *Odell, supra,* 92 Cal.App.5th at 317 ["It was no accident the *Bruen* majority repeated the qualifier 'law-abiding' some 13 times"].)

14

(*Vongxay*) ["Courts often limit the scope of their holdings, and such limitations are integral to those holdings"]; see also *United States v. Skoien* (7th Cir. 2010) 614 F.3d 638, 641 (en banc) ["whether or not technically dictum," courts "must respect" *Heller*'s remarks concerning presumptively lawful regulatory measures "given the Supreme Court's entitlement to speak through its opinions as well as through its technical holdings"].) Indeed, the validity of felon-dispossession laws appears to have been a core assumption of the opinion for the court in *Bruen*, which distinguished the challenged New York law from licensing regimes that "do not require applicants to show an atypical need for armed self-defense." (*Bruen*, *supra*, 597 U.S. at 38, fn. 9].) The Court reasoned the "objective criteria" (*id.* at 11) assessed in these licensing regimes, which, among other things, "often require applicants to undergo a background check . . . , are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" (*Id.* at 38, fn. 9], quoting *Heller*, *supra*, 554 U.S. at 635).

In addition, and contrary to defendant's suggestion that *Bruen* requires the Attorney General to present a review of historical sources to justify Section 29800, subdivision (a)(1), *Bruen*'s discussion of *Heller* confirms this is unnecessary. As *Bruen* explains, "Whether it came to defining the character of the right (individual or militia dependent), *suggesting the outer limits of the right*, or *assessing the constitutionality of a particular regulation*, *Heller* relied on text and history." (*Bruen*, *supra*,597 U.S. at 22, italics added; see also *id.* at 21 ["After holding that the Second Amendment protected an individual right to armed self-defense, [*Heller*] also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right"].)

15

There is little profit in requiring the People to duplicate work the Supreme Court undertook in authoring its opinion in *Heller*, even if the majority did not *show* all its work in that case. (See, e.g., *Hatfield v. Barr* (7th Cir. 2019) 925 F.3d 950, 953 ["If the subject were something other than a felon-dispossession statute, the Attorney General would bear a burden of justification"].)

> **D.     *Section 30605, Subdivision (a)'s Prohibition on Possessing the Rifle in This Case, Which Includes a Pistol Grip Among Other Prohibited Features, Is Constitutional on Its Face***
>      **1.     *Overview of relevant statutes***

Subject to exceptions not applicable here, section 30605, subdivision (a) prohibits the possession of "any assault weapon." Sections 30510 and 30515 define an "assault weapon" both by identifying specific firearms according to their manufacturer and model or series (§ 30510) and by reference to just the features certain firearms may have (§ 30515). It is the feature-based definition that is implicated in this appeal.

The trial court's instruction on the assault weapon charge in this case was derived from section 30515, subdivision (a). Among other things, the subdivision states an assault weapon includes (1) a semi-automatic, centerfire rifle that does not have a fixed magazine but has either a pistol grip that "protrudes conspicuously beneath the action of the weapon," a thumbhole stock, a folding or telescoping stock, a grenade launcher or flare launcher, a flash suppressor, or a forward pistol grip; (2) a semi-automatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds; and (3) a semi-automatic,

16

centerfire rifle that has an overall length of less than 30 inches.[6] (§ 30515, subd. (a)(1)-(3).) The semi-automatic, centerfire rifle displayed at trial qualifies as an assault weapon under section 30515, subdivision (a)(1) because, at a minimum, it does not have a fixed magazine and features a telescoping stock, a flash suppressor, and a pistol grip that protrudes conspicuously beneath the action of the weapon.[7] It also qualifies as an assault weapon under section 30515, subdivision (a)(3) because it is less than 30 inches long.

### 2. The high court's approach to restrictions on dangerous and unusual weapons

*Heller* explains the Second Amendment right to bear arms does not prohibit regulation of "weapons not typically possessed by law-abiding citizens for lawful purposes . . . ." (*Heller*, *supra*, 554 U.S. at 625.) The Court provided two examples of such

---

[6] The binary trigger system that the gun in this case has does not figure into this statutory definition of an assault weapon. Section 32900 does separately prohibit the possession of "any multiburst trigger activator," but defendant was not charged with violating section 32900.

[7] As set forth in California Code of Regulations, title 5471, section 5471(z), a "'[p]istol grip that protrudes conspicuously beneath the action of the weapon' means a grip that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing. . . ." This regulation applies to section 30515 pursuant to California Code of Regulations, title 5460. A photograph of defendant's weapon submitted in evidence at trial shows it satisfies this definition.

"dangerous and unusual weapons": the short-barreled shotgun at issue in its 1939 decision in *Miller* and "weapons that are most useful in military service—M-16 rifles and the like . . . ." (*Id.* at 625, 627.)

*Heller* further explains the scope of the Second Amendment does not expand with every advance in weapons technology. (*Heller*, *supra*, 554 U.S. at 627-628 ["It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. . . . But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right"].) At the same time, the Court also emphasized that the constitutional right to bear arms is not limited to weapons that existed in the 18th century.[8] (*Id.* at 582 ["the Second Amendment

---

[8] We do not read *Heller*'s limitation of the right to bear arms to weapons "'in common use'" (*Heller*, *supra*, 554 U.S. at 627) to require a granular and comprehensive review of gun ownership statistics to discern the line dividing permissible from impermissible regulation. *Miller* did not examine such figures in concluding that short-barreled shotguns are not protected, and *Heller* did not address the number of "M-16 rifles and the like" in circulation when it suggested such weapons may be "banned." (*Id.* at 627.) Moreover, mere statistics on the relative scarcity or ubiquity of a weapon may well be due to factors that are not relevant to *Heller*'s analytical approach. Instead, the analysis of whether a weapon is dangerous and unusual is focused on historical analogy (*ibid.* [compiling 17th and 18th century sources in support of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'"]) and courts must consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense" (*Bruen*, *supra*, 597 U.S. at 29).

18

extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding"]; accord *Bruen, supra*, 597 U.S. at 28 ["even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense"].)

On the question of *how* the government may regulate firearms, *Heller* explains our historical traditions accommodate categorical bans on certain types of weapons. (*Heller, supra*, 554 U.S. at 627 [referencing "the sorts of weapons protected" by the right to keep and carry arms].) Although the Court overruled the District of Columbia's ban on handgun possession in the home in *Heller*, it did not signal that categorical bans on certain types of weapons are unprecedented. Rather, it emphasized the exceedingly broad scope of the challenged ban on a class of weapon "that the American people have considered . . . to be the quintessential self-defense weapon." (*Id.* at 629.) Indeed, as already discussed, the *Heller* Court indicated that bans on other classes of weapon may be lawful.[9] (*Id.* at 627 [contemplating a

---

[9] Several of the Founding-era sources cited in *Heller* point to the "terror"-inducing qualities inherent in certain classes of weaponry, without regard to the manner in which the weapon was used or the identity of the person in possession. (See, e.g., 4 Blackstone, *Commentaries* (1769) 148-149 ["The offence of riding or going armed, with dangerous or unu[s]ual weapons, is a crime again[s]t the public peace, by terrifying the good people of the land; and is particularly prohibited by the [S]tatute of Northampton [citation] upon pain of forfeiture of the arms, and impri[s]onment during the king's plea[s]ure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour"], italics omitted; 3 Wilson, *Works of the*

"ban[ ]" on "weapons that are most useful in military service"]; *id.* at 623 ["*Miller* stands . . . for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons"].)

On the question of *why* a regulation may burden the right to self-defense, *Heller* suggests a weapon's potential utility for self-defense does not necessarily immunize it from regulation. In its discussion of the reasons that a person "may prefer a handgun [to a long gun] for home defense," the Court emphasized features that would similarly give the short-barreled shotgun at issue in *Miller* an advantage over a long gun.[10] And in stating that "M-16

---

*Honourable James Wilson* (1804) 79 [stating that a person may commit a crime against the personal safety of the citizens by "arm[ing] himelf with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people"]; Dunlap, *The New-York Justice* (1815) 8 ["It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people"].)

[10] As discussed in *Heller*, a person might favor a handgun because "[i]t is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police." (*Heller, supra,* 554 U.S. at 629.) With the possible exception of the last example, all of these considerations might make a short-barreled shotgun preferable to a long gun. Additionally, for a shooter concerned about the risk to people other than his or her intended target, the reduction in muzzle velocity might make a short-barreled shotgun preferable for self-defense in the home.

rifles and the like" are susceptible to regulation, the Court did not suggest that such weapons have no self-defense applications. (*Hanson v. District of Columbia* (D.D.C. Apr. 20, 2023, No. 22-2256 (RC)) ___ F.Supp.3d ___, ___ [2023 WL 3019777, *8] ["A weapon may have *some* useful purposes in both civilian and military contexts, but if it is *most* useful in military service, it is not protected by the Second Amendment"]; *People v. Zondorak* (2013) 220 Cal.App.4th 829, 837 ["'[I]t cannot be the case that possession of a firearm in the home for self-defense is a protected form of possession under all circumstances. By this rationale, any type of firearm possessed in the home would be protected merely because it could be used for self-defense. Possession of machine guns or short-barreled shotguns—or any other dangerous and unusual weapon—so long as they were kept in the home, would then fall within the Second Amendment. But the Supreme Court has made clear the Second Amendment does not protect those types of weapons'"].)

>         3.      *Application*

Summarizing what we have just discussed, *Heller* and its progeny establish that a class of weapon may be regulated as dangerous and unusual, notwithstanding its potential utility for self-defense, if it is most useful in military service (*Heller*, *supra*, 554 U.S. at 627) or if it is "not typically possessed by law-abiding citizens for lawful purposes" (*id.* at 625). We now apply these principles and conclude the assault weapon restrictions in section

21

30515, subdivision (a) that are at issue in this case are not facially unconstitutional.[11]

As explained earlier, the rifle that the jury found defendant to have possessed qualifies as an assault weapon under section 30515, subdivision (a)(3) (it is a semi-automatic, centerfire rifle less than 30 inches long) and for several reasons under section 30515, subdivision (a)(1) (it is a semi-automatic, centerfire rifle that does not have a fixed magazine but has a telescoping stock, a flash suppressor, and a pistol grip that protrudes conspicuously beneath the action).[12]

In determining whether the combination of proscribed features at issue in this case renders defendant's weapon most useful in military service, we do not undertake a direct comparison to the M-16. Our record does not include M-16 specifications, and even if it did, the fact that defendant's weapon was outfitted with a binary trigger system complicates any attempt to compare rate of fire, which some have emphasized as

---

[11]     Because defendant presents only a facial challenge to his conviction, we need only reach a conclusion that any one of these features defining, and consequently banning, an assault weapon suffices to bring a weapon with that feature within the scope of weapons that are not typically possessed by law-abiding citizens for lawful purposes. For the sake of completeness, however, the discussion that follows treats all of the statutorily prohibited features as a group.

[12]     The Attorney General contends "the Second Amendment does not protect accessories and configurations that are not essential to the operation of firearms." Even if this argument is correct and dispositive as to section 30515, subdivision (a)(1), it does not extend to section 30515, subdivision (a)(3).

a material difference between semi-automatic assault weapons and automatic weapons like the M-16. (See, e.g., *Heller v. District of Columbia* (D.C. Cir. 2011) 670 F.3d 1244, 1288-1289 (dis. opn. of Kavanaugh, J.).) More fundamentally, it would be difficult to compare a list of proscribed features to a specific weapon with its full suite of features. (See *Kolbe v. Hogan* (4th Cir. 2017) 849 F.3d 114 [in comparing prohibited weapons to an M-16, "[t]he relevant question is not . . . whether they have this or that single feature in common with a non-banned firearm. Rather, the issue is whether [they] possess an amalgam of features that render [them] like M16s and most useful in military service"], disapproved on another ground in *Bruen, supra,* 597 U.S. at 18-19.)

Regardless of whether the features that qualify defendant's gun as an assault weapon may be useful in civilian self-defense scenarios, the advantages they confer over weapons that do not qualify as assault weapons serve a predominately military purpose. Defendant's weapon is configured for portability and maneuverability *plus* the capacity to sustain rapid fire for an extended period over a relatively long distance. While the line between weapons most useful in civilian life and weapons most useful in military service may not always be clear, this combination of attributes is martial in focus. (See *Bevis v. City of Naperville* (7th Cir. 2023) 85 F.4th 1175, 1195 [rejecting a constitutional challenge to, among other laws, the Protect Illinois Communities Act (Pub. Act 102-1116 (2023)].)

The Fourth Circuit's en banc decision in *Kolbe, supra,* 849 F.3d 114 helps to illustrate the point. *Kolbe* upheld a Maryland statute that banned, among other things, "a semiautomatic centerfire rifle that has an overall length of less than 29 inches"

or "can accept a detachable magazine" and "has any two of the following: 1. a folding stock; 2. a grenade launcher or flare launcher; or 3. a flash suppressor . . . ." (*Kolbe, supra*, 849 F.3d at 122.) Considering whether these features render banned weapons most useful in military service, the court held it was "uncontroverted" that they do, citing evidence "reflecting that the banned assault weapons are designed to 'kill[ ] or disabl[e] the enemy' on the battlefield, and that '[t]he net effect of [their] military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns.'" (*Id.* at 144.)

The United States Supreme Court has held that the Second Amendment protects Californians' right to possess other guns, but the provisions of section 30515, subdivision (a) that outlaw possession of the firearm in this case are facially constitutional.

### E. Substantial Evidence Supports Defendant's Convictions

When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we review the record "'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.) Here, defendant contends there was no substantial evidence that he had either actual or constructive possession of the gun recovered from the Tahoe to support his convictions.

24

"'"A defendant has actual possession when the weapon is in his [or her] immediate possession or control,'" i.e., when he or she is actually holding or touching it.  [Citations.]" (*People v. Bay* (2019) 40 Cal.App.5th 126, 132.)  Constructive possession, however, requires only that the defendant "'knowingly exercised a right to control the prohibited item, either directly or through another person.'  [Citation.]" (*Ibid.*)  Constructive possession need not be exclusive.  (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410 ["Possession may be imputed when the [item in question] is found in a place which is immediately accessible to the joint dominion and control of the accused and another"].)  And although prior cases have held that "mere proximity to [a] weapon, standing alone, is not sufficient evidence of possession" (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417, disapproved on another ground in *People v. Farwell* (2018) 5 Cal.5th 295, 304, fn. 6), the requisite "inference of dominion and control is easily made when the [item in question] is discovered in a place over which the defendant has general dominion and control: his residence [citation], his automobile [citation], or his personal effects [citation]." (*People v. Jenkins* (1979) 91 Cal.App.3d 579, 584.)

Deputy Ventura testified defendant was seated immediately next to the gun and shell casing, and documentary evidence revealed he was the Tahoe's owner.  The fact that defendant was in the passenger seat does not undermine the inference of dominion and control permitted by *Jenkins*, *supra*, 91 Cal.App.3d at page 584 because defendant acknowledged he could not drive with his broken leg.  And even if this were a close case, defendant's abortive attempt to flee reflects a consciousness of guilt that further supports a finding of constructive possession.

(*Bay, supra*, 49 Cal.App.5th at 133.) Defendant's protest that his own testimony denying any connection to the Tahoe somehow defeats the notice of release of liability and Deputy Ventura's testimony fails because the jury was entitled to find defendant was not credible. (*People v. Ware* (2022) 14 Cal.5th 151, 167.)

> F. *The Trial Court Did Not Abuse Its Discretion in Denying Defendant's* Romero *Motion*
> 1. *Additional background*

Prior to sentencing, defendant filed a *Romero* motion to strike or dismiss his prior strike conviction based on the differences between the current offense conduct and his prior offense and defendant's role as a provider for his family. The trial court denied defendant's motion. It considered, among other things, "the fact that . . . defendant took the witness stand in his own defense and told a story that was . . . preposterous in denying responsibility," his conviction for possession of ammunition by a felon in November 2021 (based on offense conduct occurring about a week before his arrest in this case), and several other prior offenses, including sustained petitions for possession of a dangerous weapon and possession of live ammunition as a juvenile.[13] The trial court concluded defendant's "background, character and prospects put him precisely within the four corners of exactly what the Legislature and the voters

___

[13] The probation report on which the trial court relied also indicated that, "[p]er probation records[,] . . . defendant is a documented member of the criminal street gang 'Lennox 13' and goes by the moniker 'Flat Face' and 'Chops.'"

intended that [the Three Strikes law] would address, which is revolving door criminals who keep picking up new cases."

## 2. *Relevant legal principles*

Under section 1385, subdivision (a), a judge may, "either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." "'In *Romero*, [our Supreme Court] held that a trial court may strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony, on its own motion, "in furtherance of justice" pursuant to . . . section 1385(a).' [Citation.]" (*People v. Carmony* (2004) 33 Cal.4th 367, 373.)

"'[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law . . . or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' [Citation.]" (*Carmony*, *supra*, 33 Cal.4th at 377.)

We review the trial court's decision not to dismiss a prior felony conviction allegation under section 1385 for abuse of discretion. (*Carmony*, *supra*, 33 Cal.4th at 378.) The standard is deferential. (*Id.* at 378; *People v. Myers* (1999) 69 Cal.App.4th 305, 310 ["Where the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in

27

conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance"].)

### 3.    *Application*

Here, defendant contends the trial court should have given greater weight to what he considers the non-violent nature of both the current offense and of his prior conviction for making criminal threats.  Even assuming that is the right view of the current and prior offense, defendant's criminal conduct does not, however, take him outside the spirit of the Three Strikes law. (*People v. Strong* (2001) 87 Cal.App.4th 328, 344.)  In addition, nothing in the record indicates the specific circumstances of either this case or defendant's prior case merit a departure from the Three Strikes law.  Defendant's attempt to characterize the offense conduct giving rise to his conviction for making criminal threats as "a misunderstanding between two individuals at a bus stop" is based on an unsupported assertion in his *Romero* motion.

Defendant also contends the trial court should have given greater weight to evidence that he was stably employed and providing for his family.  The trial court considered the many character letters submitted by defendant's family and others, but these letters omit significant details regarding defendant's circumstances.  Defendant asserted, for example, that he was "gainfully employed," but there are no details regarding how long he had been employed and whether he worked full-time.  In any case, rather than reflecting positively on defendant's character and prospects, the trial court determined defendant "ha[d] not taken advantage of family support and ha[d] decided . . . to pursue a criminal lifestyle."  That is a reasonable conclusion to

28

draw.  In addition, the record reflects the criminal conduct here was not an aberration or an isolated mistake by someone making a genuine effort to reform: defendant was still on parole for his 2016 conviction for making criminal threats at the time of his arrest in this case and he had been separately charged for possession of ammunition only about a week earlier.

Considering the full record, we hold the court appropriately balanced the relevant factors and did not abuse its discretion in determining that defendant is within the spirit of the Three Strikes law.

> G.     *The Trial Court Must Impose a Sentence for Possession of an Assault Weapon on Remand*

The trial court's decision to "stay" punishment for possession of an assault weapon without imposing a sentence was error.  "[W]hen a trial court determines that section 654 applies to a particular count, the trial court must impose sentence on that count and then stay execution of that sentence.  There is no authority for a court to refrain from imposing sentence on all counts, except where probation is granted.  And failing to impose sentence on all counts can lead to procedural difficulties if the count on which sentence was imposed is later reversed or vacated."  (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1466.)

We invited defendant and the Attorney General to submit supplemental briefs addressing this issue, and both agree remand is necessary.  We shall reverse the sentence and remand for the trial court to pronounce a sentence on all counts and stay execution under section 654 as necessary.  (*People v. Taylor* (1971) 15 Cal.App.3d 349, 353 ["In a case where the court fails to pronounce judgment with respect to counts on which convictions

29

were validly obtained, the Court of Appeal has power to remand for the purpose of pronouncement of a judgment in accordance with the verdict.  [Citation.]  When such a mistake is discovered while [the] defendant's appeal is pending, the appellate court should affirm the conviction and remand the case for a proper sentence"].)

## DISPOSITION

Defendant's sentence is reversed and the cause is remanded for resentencing consistent with this opinion.  In all other respects, the judgment is affirmed.


## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:


RUBIN, P. J.


KIM, J.


30